**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| Christopher Hubbert (R58946), | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 23 C 50225 |
| v. | ) | |
| | ) | Hon. Iain D. Johnston |
| Rob Jefferies, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Christopher Hubbert, an Illinois prisoner proceeding *pro se*, brings this civil rights action under 42 U.S.C. § 1983 alleging that Defendants Dr. Larry Sy, Nurse Practitioner Susan Tuell, And Dr. Merrill Zahtz were deliberately indifferent to his serious medical needs relating to urinary tract pain and difficulty urinating. Plaintiff also alleges Wexford Health Sources, Inc. maintains unconstitutional policies or practices that resulted in a deprivation of his Constitutional rights. Currently before the Court are Defendants' motion for summary judgment. Dkt. 52. Also before the Court is Plaintiff's motion for attorney representation Dkt. 62. For the reasons set forth below, the Court grants Defendants' motion for summary judgment, and denies Plaintiff's motion for attorney representation.

### I. Summary Judgment Standard

**A. Federal Rule of Civil Procedure 56(a)**

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704-05 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

The party seeking summary judgment has the initial burden of demonstrating the "absence of evidence to support the non-moving party's case." *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If this burden is met, the opposing party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### B. Local Rule 56.1 (N.D. Ill.)

Local Rule 56.1 governs how to present and how to dispute facts in litigating motions for summary judgment in this District. *See* L.R. 56.1 (N.D. Ill.). Under Local Rule 56.1(a)(2), the moving party must provide a statement of material facts, and "[e]ach asserted fact must be supported by citation to the specific evidentiary material, including the specific page number, that supports it. The court may disregard any asserted fact that is not supported with such a citation." L.R. 56.1(d)(2).

The opposing party must then respond to the movant's statements of fact. *Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005); L.R. 56.1(e). In the case of any disagreement, "a party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact. Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." L.R. 56.1(e)(3). The party opposing

2

summary judgment may also submit "a statement of additional material facts," to which the moving party must respond in the same manner stated above. L.R. 56.1(b)-(c). A party's *pro se* status does not excuse him from complying with Local Rule 56.1. *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006).

Although the Court is entitled to demand strict compliance with Local Rule 56.1, *see Coleman v. Goodwill Indus. of Se. Wis., Inc.*, 423 F. App'x 642, 643 (7th Cir. 2011) (unpublished), it will generously construe the facts identified by Plaintiff to the extent they are supported by the record, or he could properly testify to them. *See Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016) (courts may construe *pro se* submissions leniently). The Court will not look beyond the cited material, however. *See Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 898 (7th Cir. 2003) ("[D]istrict courts . . . are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them.").

Additionally, Plaintiff's failure to strictly comply with Local Rule 56.1 is not a basis for automatically granting the Medical Defendants' motion. *Robinson v. Waterman*, 1 F.4th 480, 483 (7th Cir. 2021). Rather, the Court is mindful that the moving party has the "ultimate burden of persuasion" to show entitlement to judgment as a matter of law. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006). The Court will apply these standards in evaluating the evidence.

## II. Background

### A. Procedural Background

Defendants filed their motion for summary judgment, along with a memorandum of law, a Local Rule 56.1(a) statement of material facts, and supporting exhibits. Dkt. 52-54. As required by Local Rule 56.2, the Wexford Defendants also provided Plaintiff with a formal Notice to *Pro Se* Litigant Opposing Motion for Summary Judgment. Dkt. 55-57.

Even so, Plaintiff did not respond to Defendants' statements of fact, failing to comply with Local Rule 56.1. The opposing party "must cite specific evidentiary material that controverts the fact[.]" N.D. Ill. L.R. 56.1(e)(3). "[M]ere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material." *Smith v. Lamz,* 321 F.3d 680, 683 (7th Cir. 2003). Facts asserted by the moving party "may be deemed admitted if not controverted with specific citations to evidentiary material." N.D. Ill. L.R. 56.1(e)(3).

While Plaintiff submitted a response to the motion for summary judgment, Dkt. 61, it contains no substantive response to the claim, and he did not respond to Defendants' statements of fact. Instead, he seems to rely on Fed. R. Civ. P. 56 (d), stating that he required additional discovery, and that, based on that assertion, the motion should be denied. He also sought recruitment of counsel. Dkt. 62. With respect to Plaintiff's response, and any reference to Fed. R. Civ. P. 56 (d), Rule 56(d) provides that courts may allow for extra time if a nonmovant "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition [to a motion for summary judgment.]" *Christensen v. Weiss*, 145 F.4th 743, 754 (7th Cir. 2025); *citing* Fed. R. Civ. P. 56(d). Under the rule, the Plaintiff bore the burden to make that showing as the nonmovant. *MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, 994 F.3d 869, 877 (7th Cir. 2021). "As is true for most matters relating to discovery, the district court has substantial discretion in ruling on a Rule 56(d) motion." *Smith v. OSF Healthcare Sys.*, 933 F.3d 859, 865 (7th Cir. 2019) (citation omitted).

The Court has reviewed the docket with regard to discovery in this case and finds that the Magistrate Judge oversaw discovery between July 10, 2024, and July 1, 2025. Dkt. 39-50. Discovery closed on July 1, 2025, with the notation in the docket entry: "The parties reported that Plaintiff's deposition has been completed and fact discovery is closed." Dkt. 50. While discovery

was ongoing, Plaintiff registered no objections, made no motions to compel, or otherwise complained about problems in the discovery process. Additionally, Defendants have attached medical records to their summary judgment materials. Dkt. 53-1 through 53-4. Further, while Plaintiff has attached a declaration to his response stating that he was relying on jail house lawyers in his litigation and did not know he was entitled to his own discovery, he does not detail what efforts he has made to attempt to obtain discovery, albeit untimely. "The mere fact that discovery is incomplete is not enough to prevent summary judgment." *Smith v. OSF Healthcare Sys.*, 933 F.3d 859, 864 (7th Cir. 2019). A party seeking relief under Rule 56(d) must show specific reasons why discovery should be extended, "which requires more than a fond hope that more fishing might net some good evidence." (*Id.*)

Rule 56(d) "is not a shield that can be raised to block a motion for summary judgment without even the slightest showing by the opposing party that his opposition is meritorious." *Lamb's Patio Theatre v. Universal Film Exch.*, 582 F.2d 1068, 1071 (7th Cir. 1978) (quoting *Willmar Poultry Co. v. Morton-Norwich Prod., Inc.*, 520 F.2d 289, 297 (8th Cir. 1975)). Rather, a party invoking the rule "must do so in good faith" by showing "how postponement of a ruling on the motion will enable him, by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact." *Id*. The rule's requirements apply to pro se litigants as well as represented parties. *See Hung Nam Tran v. Kriz*, 377 Fed. Appx. 542, 545 (7th Cir. 2010). While Plaintiff did submit a declaration supporting his request for discovery, his only explanation is that he did not know he could obtain his own discovery. But, the docket indicates he never asked for it during discovery, allowing discovery to close with his agreement, without any objection or protest. Accordingly, because Plaintiff has shown a lack of diligence, or in any way described how

additional discovery might assist him in arguing against summary judgment, or otherwise supporting his claim, any relief requested pursuant to Fed. R. Civ. P. is denied.

Based on the governing law and the Local Rule, the Court deems Defendants' statements of fact admitted to the extent they are facts and supported by the record. The Court also keeps in mind that the moving party has the "ultimate burden of persuasion" to show entitlement to judgment as a matter of law. *Raymond*, 442 F.3d at 608.

### B. Factual Background

Plaintiff Christopher Hubbert ("Plaintiff") is in State custody and has been incarcerated at Dixon Correctional Center for the times relevant to the allegations in his lawsuit. (Defs' SOF, Dkt. 53, ¶ 1.)

Dr. Larry Sy ("Dr. Sy") has been employed by Wexford Health Sources, Inc., as a physician at the Dixon Correctional Center in Dixon, Illinois, since August 9, 2021. (*Id*. at ¶ 2.) Dr. Sy became the Medical Director on or about March 29, 2022. (*Id*.) As Medical Director for the Dixon Correctional Center, his job duties include providing medical care and treatment to inmates at the prison and participating in collegial reviews regarding requests for off-site medical care and treatment for inmates. (*Id.*)

Nurse Practitioner Tuell ("NP Tuell") was employed by Wexford Health Sources, Inc., as a nurse practitioner at the Dixon Correctional Center in Dixon, Illinois, from August 13, 2013, until her retirement on January 3, 2025. (*Id*. at ¶ 3.) As a nurse practitioner at the Dixon Correctional Center, her job duties included providing medical care and treatment to inmates. (*Id.*)

Dr. Zahtz ("Dr. Zahtz") was employed by Wexford Health Sources, Inc. as its Medical Director at the Dixon Correctional Center from December 4, 2017, through March 28, 2022, at which time he transferred to the Sheridan Correctional Center. (*Id*. at ¶ 4.) As Medical Director

for the Dixon Correctional Center, his job duties included providing medical care and treatment to inmates at the prison and participating in collegial reviews regarding requests for off-site medical care and treatment for inmates. (*Id.*)

On February 23, 2020, Plaintiff attended a sick call, where he was seen by an attending nurse for complaints of pain in his penis and a burning sensation while urinating. (*Id.* at ¶ 5.)  He reported "8/10" pain while urinating, and that he was urinating frequently. (*Id* .) The nurse noted the color of his urine to be a straw yellow, with an unusual odor and with abnormal findings on a urine dipstick test. (*Id.*)  The nurse referred Plaintiff to a provider for a higher level of care. (*Id.*)  The same day, Tuell prescribed a 10-day course of Bactrim for Plaintiff, which is an antibiotic commonly used to treat urinary tract infections.  (*Id.* at ¶ 6.)

On March 10, 2020, Plaintiff returned to the Dixon sick call and saw another attending nurse, for complaints of frequent urination.  (*Id.* at ¶ 7.)  The nurse noted a similar straw color to his urine, but with no unusual odor, and noted that Plaintiff was not in any apparent distress at the appointment. (*Id.*)  The nurse prescribed Plaintiff 325 mg of acetaminophen, advised Plaintiff on proper hydration, and advised him to return in 48 hours if he had no improvement in his symptoms. (*Id.*)

On March 11, 2020, NP Tuell saw Plaintiff as a follow-up to his sick call the prior day and his complaint of burning with urination.  (*Id.* at ¶ 8.)  At that time, Plaintiff told her he no longer suffered a burning sensation when he urinated, but he had to force his urine. (*Id.*) She found Plaintiff to be alert and oriented and in no acute distress and noted he had a negative urine dip the prior day and had completed a round of Bactrim antibiotic on February 23, 2020. (*Id.*)  She offered to check Plaintiff's prostate, but he declined. (*Id.*) She assessed Plaintiff with urinary hesitancy,

prescribed him Flomax, which is used to promote good urinary flow, and planned to follow up with him on April 2, 2020. (*Id*.)

On or about March 16, 2020, the Illinois Department of Corrections put a halt to inmate movement inside and outside of prisons throughout Illinois, including the Dixon Correctional Center, due to the onset of the COVID-19 pandemic. (*Id*. at ¶ 9.) This caused the medical unit to triage patient appointments and follow-ups to prevent the spread of COVID-19 within the prison. (*Id*.) As a result, some appointments were rescheduled to space patient visits and lessen the likelihood of patients being in close contact with one another within the waiting areas of the healthcare unit. (*Id*)

On May 5, 2020, RN Poff saw Plaintiff to assess his on-going urinary symptoms. (*Id*. at ¶ 11.) Plaintiff reported his symptoms had not changed since mid-February, "10/10" pain, and straw-colored urine with unusual odor. (*Id*.) She noted Plaintiff was on Flomax and, per his report, urinating 10 to 15 times a day. *Id*. On examination, RN Poff found Plaintiff's general appearance to be within normal limits ("WNL"), and that his urine specimen showed no bacterial changes. (*Id*.) RN Poff advised Plaintiff to take his medications as directed and referred him to a nurse practitioner for further evaluation. (*Id*.)

On May 7, 2020, NP Mershon attempted to see Plaintiff for further evaluation but was unable to do so because he was at work; she noted he would be rescheduled. (*Id*. at ¶ 12.) She subsequently tried to see him on May 18, 2020, but again needed to reschedule the appointment so a digital rectal exam could be performed in the healthcare unit. (*Id*.) NP Mershon again attempted to meet with Plaintiff on May 19, 2020, but Plaintiff was a no show for his scheduled healthcare pass. (*Id*.)

On May 20, 2020, NP Mershon saw Plaintiff for his digital rectal exam, to check his prostate for assessment of his urinary issues. (*Id*. at ¶ 13.)  Plaintiff denied any relief from his Flomax but also denied any symptoms of a urinary tract infection. [*Id*.]. NP Mershon noted that Plaintiff had no palpable nodules or tenderness felt, and that there was no obvious enlargement of Plaintiff's prostate. (*Id*.)  She assessed Plaintiff with urinary hesitancy, prescribed him Hytrin—which is also used to promote good urinary flow—and planned to follow up with Plaintiff on June 3, 2020. (*Id*.)

On June 4, 2020, NP Mershon saw Plaintiff for a follow-up regarding his Hytrin.  (*Id*. at ¶ 14.)  Plaintiff advised her that he had little-to-no relief with his Hytrin prescription, but he deferred an examination at that time. (*Id*.)  NP Mershon assessed Plaintiff with urinary hesitancy and increased his Hytrin dosage to 4mg and planned a follow up for him in two weeks. (*Id*.)

On June 22, 2020, Dr. Carlos Fior saw Plaintiff for his 2-week follow-up.  (*Id*. at ¶ 15.)  Plaintiff reported to Dr. Fior that he had to force his urine even while taking Hytrin. (*Id*.)  Dr. Fior noted Plaintiff was in no acute distress but was reporting mild burning in his penis. (*Id*.)  Dr. Fior assessed Plaintiff with prostatism symptoms while also planning to rule out a possible UTI. (*Id*.)  Dr. Fior ordered a urine dip stick test and wrote a prescription for Vibramycin—an antibiotic commonly used to treat urinary tract infections—and ordered that Plaintiff return to the healthcare unit in one week for a follow-up. (*Id*.)

On July 6, 2020, Dr. Fior saw Plaintiff for a follow-up, at which time Plaintiff reported he had no urinary symptoms or other problems. (*Id*. at ¶ 16.)  Dr. Fior then instructed Plaintiff to follow-up as needed. (*Id*.)

On July 29, 2020, RN Poff saw Plaintiff at sick call, at which time he complained he was "still having the same problem" and reported that his medications were not working despite taking

them for two and a half to three months. (*Id*. at ¶ 17.)  RN Poff then referred Plaintiff to see a physician. (*Id*.)

On August 4, 2020, Dr. Zahtz saw Plaintiff following RN Poff's referral regarding Plaintiff's complaints of difficulty urinating. (*Id*. at ¶ 18.)  Plaintiff reported to Dr. Zahtz that he had urinary hesitancy, dysuria, and had to force himself to urinate. (*Id*.) Plaintiff told Dr. Zahtz this was going "on and off" for months, despite antibiotic treatment, Flomax, Hytrin, and his rectal exam with no symptom findings. (*Id*.)  On examination, Dr. Zahtz observed Plaintiff's vital signs were stable. (*Id*.) Plaintiff was afebrile, in no acute distress, and alert and oriented. (*Id*.) Plaintiff's penis appeared normal, uncircumcised with retractable foreskin. (*Id*.)  He also did not report any tenderness or problems with his testicles, and Dr. Zahtz did not observe any scrotal enlargement. (*Id*.)  He assessed Plaintiff with Lower Urinary Tract Symptoms (LUTS) and noted his suspicion of possible obstructive uropathy. (*Id*.) Dr. Zahtz increased the dose of Plaintiff's Hytrin to 6mg, ordered an onsite ultrasound of his abdomen and pelvis, and ordered several lab tests including a urine analysis. (*Id*.)

On August 12, 2020, Dr. Fior saw Plaintiff to discuss the results of his urology ultrasound, which was completed August 5, 2020. (*Id*. at ¶ 19.)  Dr. Fior informed Plaintiff that his ultrasound findings were negative for any abnormal findings and assessed him with possible prostatism. (*Id*.) Dr. Fior continued Plaintiff's prescribed course of care. (*Id*.)

On December 30, 2020, RN Ashley Heffelfinger saw Plaintiff at sick call for a possible UTI. (*Id*. at ¶ 20.)  She noted that, while Plaintiff's urine was dark, there was no usual odor, no abnormal bacterial findings, and a UTI was ruled out. (*Id*.) RN Heffelfinger advised Plaintiff to hydrate and return to the healthcare unit if his symptoms worsened or failed to improve. (*Id*.)

On January 4, 2021, NP Mershon referred Plaintiff to a local urologist for further treatment of his on-going urology issues. (*Id*. at ¶ 21.) In making her referral, she noted that Plaintiff continued to complain of urinary hesitancy and dysuria, denied significant relief with Hytrin, and had no relief with antibiotic treatment and Flomax. (*Id*.) She also noted that his ultrasound was unremarkable, and he had no active infection. (*Id*.)

On February 12, 2021, Plaintiff saw Dr. Steven Chung at Katherine Shaw Bethea Hospital in Dixon, IL ("KSB"). (*Id*. at ¶ 22.) Dr. Chung assessed Plaintiff with a possible urethral stricture and recommended a cystoscopy, which is a procedure whereby a thin tube is inserted in the urethra to examine the urinary tract. (*Id*.) On February 13, 2021, Dr. Zahtz approved this recommendation. (*Id*.) Chung did not diagnose him with a UTI, just a possible stricture. (*Id*.)

On March 15, 2021, Dr. Chung performed a cystoscopy to address Plaintiff's urethral stricture. (*Id*. at ¶ 23.) During the procedure, Dr. Chung noted Plaintiff had prostate hyperplasia and a tight urethral stricture, but no mass, lesions, or stones in the bladder. (*Id*.) The procedure was completed without complications, and Dr. Chung administered a Kenalog steroid injection to the stricture site during the procedure. (*Id*.) Dr. Chung also inserted a foley indwelling catheter, which he planned to remove one week later, and prescribed a course of Ciprofloxacin, an antibiotic, for Plaintiff. (*Id*.) Dr. Chung did not prescribe any pain medication for Plaintiff after his March 15 surgery. (*Id*.)

The same day, after his surgery, Plaintiff was brought to the Dixon infirmary, as opposed to his housing unit, where he was kept under 23-hour observation. (*Id*. at ¶ 24.) Dr. Zahtz saw Plaintiff that day and found his vital signs to be stable and he was in no acute distress or pain. (*Id*.) Dr. Zahtz noted Plaintiff's foley bag connected to his indwelling catheter had clear yellow urine in it. (*Id*.) He ordered Ciprofloxacin for Plaintiff and Rocephin, which is an antibiotic commonly

used to treat bacterial infections of the urinary tract. (*Id*.) Further, Dr. Zahtz submitted a referral request to the prison's writ office for Plaintiff to have a follow up with Dr. Chung to remove the indwelling foley catheter. (*Id*.) Dr. Zahtz also noted that if Plaintiff was stable, he could be discharged from the infirmary back to his housing unit the following day. (*Id*.)

On March 22, 2021, Nurse Denning saw Plaintiff to address his question about when his catheter would be removed. (*Id*. at ¶ 25.) She noted that Plaintiff was in no pain, his foley had clear yellow urine in it, and that Plaintiff was walking around the day room in no apparent distress. (*Id*.) Her prescribed plan of treatment was to continue to monitor him and provide treatment as ordered by his providers. (*Id*.)

On March 26, 2021, Plaintiff returned to Dr. Chung's office at KSB Hospital, at which time his foley catheter was removed without complication. (*Id*. at ¶ 26.) Also on March 26, 2021, NP Mershon saw Plaintiff after his foley catheter was removed. (*Id*. at ¶ 27.) Plaintiff denied any concerns or symptoms, denied difficulty urinating, and stated he wanted to be discharged back to his housing unit. (*Id*.) NP Mershon then submitted a referral for additional follow up at KSB and with Dixon providers. (*Id*.)

On April 2, 2021, Plaintiff returned to Dr. Chung's office, at which time Dr. Chung noted Plaintiff had a good size and strength to his urinary stream, without burning, and planned to follow up with Plaintiff in three months. (*Id*. at ¶ 28.) On April 13, 2021, Dr. Zahtz saw Plaintiff for a follow-up after his appointment with Dr. Chung. (*Id*. at ¶ 29.) At that time, Dr. Zahtz submitted a referral request to the prison's writ office to return Plaintiff to Dr. Chung's office in two months. (*Id*.)

On April 21, 2021, Dr. Zahtz's referral request was denied during a collegial review with a Wexford utilization management physician, since Plaintiff was doing well at his most recent

urology appointment. (*Id*. at ¶ 30.) The utilization management physician proposed an alternative treatment plan of monitoring Plaintiff onsite for any recurrence of his urinary symptoms, and, if so, to refer him to the urology clinic at the University of Illinois at Chicago (UIC) Hospital. (*Id*.)

On May 11, 2021, Dr. Zahtz saw Plaintiff to discuss the alternative treatment plan for his urology issues. (*Id*. at ¶ 31.) Plaintiff advised that he was doing "ok" and did not have more urinary symptoms. (*Id*.) Dr. Zahtz advised him to return to sick call if his symptoms were to recur, to which he voiced his understanding. (*Id*.)

On July 27, 2022, NP Tuell referred Plaintiff for another local urology appointment with Dr. Chung, due to Plaintiff's development of mid-shaft penile pain. (*Id*. at ¶ 32.) She noted that Plaintiff did not have problems urinating anymore, noting he had a good urinary flow. (*Id*.) On September 15, 2022, Plaintiff had his further appointment with Dr. Chung. (*Id*. at ¶ 33.) During the appointment, Dr. Chung assessed Plaintiff with a possible UTI or possible recurrence of his urethral stricture. (*Id*.) Dr. Chung ordered a urinary culture, antibiotics, and a flexible cystoscopy. (*Id*.) On October 4, 2022, Dr. Sy obtained approval from Wexford Health Sources to send Plaintiff for a cystoscopy with Dr. Chung's office. (*Id*. at ¶ 34.) On October 13, 2022, NP Chelsea Sword saw Plaintiff regarding the results of a urinalysis that had been collected on October 4, 2022. (*Id*. at ¶ 35.) She noted the results of the urinalysis were unremarkable. (*Id*.) She noted that Plaintiff was to follow up with his urologist as already planned. (*Id*.)

On December 19, 2022, Dr. Chung performed another cystoscopy on Plaintiff at KSB. (*Id*. at ¶ 36.) Dr. Chung noted the cystoscopy revealed findings of moderate prostate hyperplasia, but no urethral structures, and with all other findings normal. (*Id*.) Dr. Chung prescribed Plaintiff Ciprofloxacin and recommended a six-month follow-up. (*Id*.)

On December 27, 2022, Dr. Sy saw Plaintiff for a writ return follow up after his cystoscopy. (*Id*. at ¶ 37.) Plaintiff stated he was having problems with his penile shaft and had previously had surgery for a urethral stricture. (*Id*.) Plaintiff further stated he was upset that Dr. Chung did not address his penile shaft pain. (*Id*.) Dr. Sy noted that Plaintiff had undergone a cystoscopy that was normal. (*Id*.) Dr. Sy then submitted a referral request to the prison's writ office to have Plaintiff returned to Dr. Chung's office in six months and instructed Plaintiff to discuss his issues with Dr. Chung at that time. (*Id*.)

On December 29, 2022, NP Tuell saw Plaintiff, at which time he advised he did not want to return to KSB for his urology care, so NP Tuell instead referred him to a urologist at the University of Illinois at Chicago Hospital ("UIC"). (*Id*. at ¶ 38.) Plaintiff admitted that he refused further follow ups with KSB on December 29, 2022. (*Id*.) On November 11, 2023, Plaintiff saw Dr. Matthew Del Pino at UIC urology. (*Id*. at ¶ 39.) Dr. Del Pino assessed Plaintiff with a history of a urethral stricture and persistent LUTS. (*Id*.) Dr. Del Pino recommended an additional cystoscopy with uroflowmetry, and a urinalysis and urine culture two weeks before this testing. (*Id*.) On December 5, 2023[1], Dr. Sy approved Dr. Del Pino's recommendations. (*Id*. at ¶ 40.)

On May 1, 2023, Plaintiff saw Dr. Cassandra Palmer at UIC. (*Id*. at ¶ 41.) Dr. Palmer performed a cystoscopy with uroflowmetry, which showed Plaintiff had a normal bell-shaped curve and no obstructive causes for Plaintiff's urinary complaints. (*Id*.) Dr. Palmer recommended Plaintiff make lifestyle modifications to manage his symptoms. (*Id*.) She recommended Plaintiff avoid bladder stimulants, perform pelvic floor exercises, track his urinary volume for 2-3 days,

---

1 Although the statement of fact indicates December 5, 2024, the record supporting the statement indicates the correct date as December 5, 2023.

and follow up at UIC in 6 months. (*Id*.) NP Mershon approved all of Dr. Palmer's recommendations. (*Id*.)

Wexford Health Sources Inc. publishes and maintains medical guidelines that were available to Dixon providers while Dr. Sy, NP Tuell, and Dr. Zahtz worked at the Dixon Correctional Center. (*Id*. at ¶ 42.) These guidelines are intended to serve as reference material and are not intended to replace a clinician's professional judgment. (*Id*.)

In treating Plaintiff, Dr. Sy, NP Tuell, and Dr. Zahtz considered Plaintiff's subjective complaints, objective presentation, their examinations of him, and his medical history. (*Id*. at ¶ 43.) They also relied upon their respective training and experience, and their prior experience treating symptoms and diagnoses like Plaintiff's. (*Id*.)

At no time did Wexford or the IDOC impose upon Dr. Sy, NP Tuell, or Dr. Zahtz any incentive to control costs by delaying or denying referrals of patients to off-site specialists. (*Id*. at ¶ 44.) At no time were Dr. Sy, NP Tuell, or Dr. Zahtz aware of the cost of Plaintiff's medical treatment or the cost of his offsite referrals, and such considerations did not factor into my treatment of Plaintiff. (*Id*.) Dr. Sy, NP Tuell, and Dr. Zahtz never turned Plaintiff away from the health care unit, disregarded his complaints, or otherwise denied him medical care and treatment. (*Id*. at ¶ 45.)

Dr. Sy, NP Tuell, and Dr. Zahtz had no control over the availability of any off-site medical providers, such as Plaintiff's urologists. (*Id*. at ¶ 50.) The frequency of Plaintiff's penile pain has decreased after his March 15, 2021 surgery. (*Id*. at ¶53.) Plaintiff's urinary hesitancy (i.e. difficulties with urinary stream and frequency) have been resolved following his March 15, 2021 surgery. (*Id*. at ¶ 54.)

15

### III. Analysis

Under the Eighth Amendment, prisoners are constitutionally entitled to "humane conditions of confinement," meaning they must "receive adequate food, clothing, shelter, and medical care." *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994). To prove the Medical Defendants violated his right to receive constitutionally adequate medical care, Plaintiff must establish: (1) he "suffered an objectively serious medical condition"; (2) the Medical Defendants "knew of the condition and [were] deliberately indifferent to treating" it; and (3) "this deliberate indifference injured [Plaintiff]." *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 614 (7th Cir. 2022) (citing *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010)); *see also Farmer*, 511 U.S. at 847 ("a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it"). "A delay in treating non-life-threatening but painful conditions may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *Reck v. Wexford Health Sources, Inc.*, 27 F.4th 473, 483 (7th Cir. 2022) (citation omitted).

The Seventh Circuit explained in *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013): "No matter how serious a medical condition is, the sufferer from it cannot prove tortious misconduct (including misconduct constituting a constitutional tort) as a result of the failure to treat the condition without providing evidence that the failure caused injury or a serious risk of injury. For there is no tort—common law, statutory, or constitutional—without an injury, actual or at least probabilistic." Where a prisoner contends that prison personnel "delayed rather than denied medical assistance to an inmate, courts have required the plaintiff to offer verifying medical evidence that the delay (rather than the inmate's underlying condition) caused some degree of

harm," which means that the "plaintiff must offer medical evidence" showing that the delay was detrimental. *Id.* (citation omitted).

## A. Objectively Serious Medical Condition

An objectively serious medical condition is one that "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020) (citations omitted). The condition "need not be life-threatening" but is considered serious if failure to treat the condition "would result in further significant injury or unnecessary and wanton infliction of pain." *Gayton*, 593 F.3d at 620; *see also Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997).

Viewing the facts in the light most favorable to Plaintiff the Court finds Plaintiff's urinary tract condition constitutes objectively serious medical conditions. It is undisputed that Plaintiff received ongoing care from doctors and other medical staff at his IDOC facility and that he was consistently referred to outside clinics for ongoing treatment. Accordingly, for summary judgment purposes, the Court finds that Plaintiff suffered from objectively serious medical conditions.

## B. Deliberate Indifference

### 1. Defendants Sy, Tuell and Zahtz

Defendants Sy, Tuell, and Zahtz argue they were not deliberately indifferent to Plaintiff's condition. There is no evidence that any Defendant knew of (and disregarded) a substantial risk of harm to Plaintiff. Deliberate indifference exists only if the defendant actually "knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. The defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [s]he must also draw the inference." *Id*. Deliberate indifference poses an

17

exacting standard requiring "something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Stockton*, 44 F.4th at 615 (citation omitted). Neither "medical malpractice, negligence, [n]or even gross negligence … equate[s] to deliberate indifference." *Johnson v. Doughty*, 433 F.3d 1001, 1012-13 (7th Cir. 2006).

A treatment decision that is not "actually based on a medical judgment" can support an inference of deliberate indifference. *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011). Likewise, "another type of evidence that can support an inference of deliberate indifference is an inexplicable delay in treatment which serves no penological interest." *Petties v. Carter*, 836 F.3d 722, 730 (7th Cir. 2016), as amended (Aug. 25, 2016); Of course, not every delay in a prisoner's medical treatment gives rise to a constitutional claim. Even outside of the prison setting, patients often must wait weeks or months for specialist appointments. "[W]hether the length of a delay is tolerable depends on the seriousness of the condition and the ease of providing treatment." *Id*. In assessing a claim that a prisoner was subjected to treatment by medical professionals devoid of medical judgment, the court should "look at the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Riley v. Waterman*, 126 F.4th 1287, 1295 (7th Cir. 2025) (quoting *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc)).

Plaintiff's claim in this case is in regard to the treatment he received for urinary tract problems and problems with urine flow. The time-period in question is between February of 2020, when he first sought medical attention for pain and difficulty urinating, and May of 2023, when he received treatment from a specialist at University of Illinois Chicago, consisting of a cystoscopy which indicated he had no obstructive causes for his urinary complaints.[2] The record establishes

---

[2] Plaintiff filed suit on June 13, 2023.

that between February of 2020, and May of 2023, Plaintiff saw medical personnel, including Defendants Zahtz, Tuell and Sy on multiple dates on an ongoing and timely basis. Plaintiff was referred to a specialist, Dr. Chung, at KSB Hospital on multiple occasions, and received medications, and medical/surgical procedures to attempt to address his medical problem. His care at Dixon included multiple contacts with Defendants as well as other medical personnel, who prescribed and adjusted medications, as needed, made timely referrals to specialists, and made necessary follow-up appointments, to provide Plaintiff with care. The record establishes Plaintiff was sent to specialists locally, at KSB Hospital, and when he expressed dissatisfaction with the care he received there, Defendant Tuell changed the referral to UIC Hospital specialists, where Plaintiff continued to get care. In the three years in question, in addition to regular examinations, testing, and prescriptions, Plaintiff received an ultrasound in August of 2020, multiple cystoscopies in March 2021, December 2022, and May 2024, as well as catheters, as needed, and steroid injections.

There is evidence in the record that based upon a collegial review with a Wexford utilization management physician, a specialist referral request by Dr. Zahtz was rejected on April 21, 2021, based on the fact that Plaintiff was doing well at his most recent urology appointment. The utilization management physician proposed an alternative treatment plan of monitoring Plaintiff onsite for any recurrence of his urinary symptoms, and, if so, to refer him to the urology clinic at the University of Illinois at Chicago (UIC) Hospital. Shortly thereafter, on May 11, 2021, Dr. Zahtz saw Plaintiff to discuss the alternative treatment plan for his urology issues. Plaintiff reported that he was doing better and did not have more urinary symptoms at the time. Dr. Zahtz advised him to return to sick call if his symptoms were to recur, to which he voiced his

19

understanding. There is no evidence in the record that the alternative plan of treatment resulted in any harm to Plaintiff.

Considering this totality of medical care Plaintiff received, there was no Eighth Amendment violation here. *See Riley*, 126 F.4th at 1296 (affirming summary judgment for prison medical professionals based on totality of care despite prison physicians' minor deviations from specialist's recommendations); *Kyles v. Williams*, 679 F. App'x 497, 499-500 (7th Cir. 2017) (prison medical professionals were entitled to summary judgment because a series of appointments and reasonable medical attention for prisoner's knee issues demonstrated that providers did not consciously disregard a serious risk of harm); *Wilson v. Adams,* 901 F.3d 816, 821–22 (7th Cir. 2018) (affirming grant of summary judgment on claim of deliberate indifference where "totality" of care showed proper attention to inmate's pain).

The record does not establish any delay in treatment, and Plaintiff's allegation seem to merely express dissatisfaction with his overall care, or the fact that he on occasion still suffers from discomfort. Although it is unfortunate that Defendants efforts to treat Plaintiff's condition have not been universally effective, "the Constitution guarantees . . . treatment within the applicable standard of care, not a specific outcome.". *Page v. Obaisi*, 318 F. Supp. 3d 1094, 1104 (N.D. Ill. 2018)). Plaintiff has presented no evidence that Defendants' treatment decisions were outside the standard of care, let alone not based on the medical judgment. *Johnson v. Dominguez*, 5 F.4th 818, 826 (7th Cir. 2021); *Allen v. Frank*, 246 F. App'x 388, 391 (7th Cir. 2007) (explaining that medical professional's treatment decision does not rise to an Eighth Amendment violation "unless the medical treatment was so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition"). Although it is unfortunate that Plaintiff apparently continued to experience some knee pain during the relevant period,

adequate care does not require the total alleviation of pain and discomfort. *See Garza v. Wexford Health Sources, Inc.*, No. 19-2321, 2022 WL 3443775, at *10 (C.D. Ill. July 18, 2022) (citing *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996)); *Arce v. Wexford Health Sources, Inc.*, 75 F.4th 673, 681 (7th Cir. 2023) (Eighth Amendment "does not . . . impose the unrealistic requirement that doctors keep patients completely pain-free"); *Leiser v. Hoffman*, No. 20-2908, 2021 WL 3028147, at *3 (7th Cir. July 19, 2021) ("doctors are not deliberately indifferent when they are unable to eliminate completely a patient's pain").

To the extent there was any delay in treatment, there is no evidence that any Defendant had any control over the length of time it took for specialists, in particular at UIC to examine and treat Plaintiff. What Defendants *could* control was care at Dixon and referral to the outside hospitals and clinics. All of which, based on the record were timely, and thorough.

Additionally, to the extent Plaintiff asserts a delay in treatment amounting to a Constitutional violation, Plaintiff points to no evidence suggesting that he would have been seen sooner, more effectively, or efficiently by any specialist anywhere. Accordingly, there is no reason to believe that Plaintiff's medical outcome or level of pain would have been any different had he been referred to a different clinic or specialist during the relevant time period. *Thomas v. Chmell*, 747 F. Supp. 3d 1137 (2024) (Bucklo, J.) Because the record establishes a finding that the totality of care provided to Plaintiff belies any notion of deliberate indifference, the Court finds that the medical Defendants Zahtz, Tuell, and Sy are entitled to summary judgment. indifference.

### 2. Wexford

Plaintiff alleges that Wexford Health Sources, Inc. maintains unconstitutional policies or practices that resulted in a deprivation of his Constitutional rights. A private corporation (such as Wexford) that has contracted to provide essential government services, such as healthcare for state

inmates, may be liable under § 1983 if an inmate's constitutional violation during the provision of such services was caused by an unconstitutional policy, custom, or practice of the corporation itself. *See Shields v. Ill. Dep't of Corrs.*, 746 F.3d 782, 789 (7th Cir. 2014); see also *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978). The Court has found that based on the totality of care Plaintiff received from Defendants there was no deliberate indifference. The lack of a constitutional violation with respect to Plaintiff's medical care is fatal to his *Monell* claim. *Sallenger v. City of Springfield, Ill.*, 630 F.3d 499, 505 (7th Cir. 2010) (a claim of an unconstitutional custom or policy does not exist where "there is no underlying constitutional violation").

The Court notes that the only evidence of any Wexford involvement contained in the record involves an alternative treatment plan instituted on April 21, 2021, based on the fact that Plaintiff was doing well and had shown improvement. In addition, built into the alternative treatment plan, was onsite monitoring of Plaintiff's condition for any recurrence of urinary symptoms. If symptoms were to recur, the plan was to send Plaintiff to an outside specialist at UIC. Ultimately, when symptoms did recur, Plaintiff was so referred. Because the record is devoid of any evidence that a policy or procedure by Wexford resulted in deliberate indifference to Plaintiff's medical care, Defendant Wexford is granted summary judgment.

### IV. Plaintiff's motion for Attorney Representation

Plaintiff included in his summary judgment response materials a motion for attorney representation. Dkt. 62. The motion is denied. "Litigants in federal civil cases do not have a constitutional or statutory right to court-appointed counsel." *Walker v. Price*, 900 F.3d 933, 938 (7th Cir. 2018) (citing *Pruitt v. Mote*, 503 F.3d 647, 649 (7th Cir. 2007) (en banc)). Even so, the Court may ask an attorney to represent an indigent litigant on a volunteer basis under 28 U.S.C. §

1915(e)(1). In deciding whether to recruit counsel, the Court engages in a two-step inquiry: (1) has the plaintiff made a reasonable attempt to retain counsel on his own or been effectively precluded from doing so; and, if so, (2) given the factual and legal complexity of the case, does the plaintiff appear competent to litigate the matter himself. *Pruitt*, 503 F.3d at 654-55. The test for determining whether to recruit counsel for an unrepresented litigant is not whether the litigant would benefit from court-recruited counsel. "[T]he test is 'whether the difficulty of the case—factually and legally—exceeds the particular plaintiff's capacity as a layperson to coherently present it to the judge or jury himself.'" *Olson v. Morgan*, 750 F.3d 708, 712 (7th Cir. 2014) (quoting *Pruitt*, 503 F.3d at 655).

The Court declines to recruit counsel on Plaintiff's behalf for several reasons. First, Plaintiff has not given any indication of any efforts he made on his own to obtain counsel. The docket indicates Plaintiff did not complain about any concerns regarding his ability to pursue this case until after the close of discovery and while the summary judgment motion was pending. Defendants served on Plaintiff a Notice to Unrepresented Litigant Opposing Summary Judgment. (Dkt. 55-57.) The Notices explain what Plaintiff must do to oppose the facts submitted by Defendants. The Notices also explained how Plaintiff should present his evidence to the Court.

The Court also has considered that the claims in this case are not particularly complex and are among the type of claims that a prisoner might be called on to litigate himself. This is not a medical malpractice case demanding an in-depth understanding of the applicable standard of care. Rather, this is an Eighth Amendment deliberate indifference case – the outcome turned largely on what information was available to Defendants about the seriousness of Plaintiff's medical condition, what Defendants did in response to Plaintiff's need for care, the reasons for any delay in obtaining necessary care or denial thereof, and how the decisions affected Plaintiff's condition.

23

The bulk of that information is within Plaintiff's personal knowledge. Additionally, Plaintiff was supplied with the medical records used to support Defendants' motion for summary judgment, so he had access to any materials he might have used to rebut their arguments. Because the record clearly established no deliberate indifference based on the totality of care provided by Defendants, the Court finds there would be no benefit to recruiting Plaintiff counsel. Accordingly, the motion is denied.

### V. Conclusion

For the foregoing reasons, the Defendants' motion for summary judgment (Dkt. 52) is granted. Plaintiff's motion for attorney representation (Dkt. 62) is denied. Final judgment will be entered in favor of all Defendants. If Plaintiff wishes to appeal, he must file a notice of appeal with this court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1)(A). If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* in this court stating the issues he intends to present on appeal. *See* Fed. R. App. P. 24(a)(1).

Date: March 24, 2026          By:    _____
                                     Iain D. Johnston
                                     United States District Judge

24